# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs January 25, 2011

## STATE OF TENNESSEE v. VARION JOHNSON

**Direct Appeal from the Circuit Court for Sevier County**
**No. 13421-II       Richard R. Vance, Judge**

---

**No. E2010-01363-CCA-R3-CD-FILED-AUGUST 15, 2011**

---

A Sevier County Circuit Court jury convicted the appellant, Varion Johnson, of facilitation of aggravated robbery. The trial court imposed a sentence of nine years in the Tennessee Department of Correction. On appeal, the appellant challenges the sufficiency of the evidence sustaining his conviction. Upon review, we reverse the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Reversed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and JAMES CURWOOD WITT, JR., J., joined.

Amber D. Haas, Sevierville, Tennessee, for the appellant, Varion Johnson.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel West Harmon, Assistant Attorney General; James B. Dunn, District Attorney General; and George C. Ioannides, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I.  Factual Background

The Sevier County Grand Jury indicted the appellant and his co-defendant, Chad Allen Love, for aggravated robbery. During a joint trial, Detective Tim Williams of the Gatlinburg Police Department testified that on April 20, 2008, he assisted with the investigation of an aggravated robbery that occurred at the McDonald's restaurant on Highway 321 in Sevier County. He said he was informed that "an individual had gone in there shortly after closing and presented a weapon to the victim who was in the office counting money and robbed her of that money." Detective Williams said that when he observed the McDonald's surveillance video, he recognized the appellant. He later identified

Love "through photographs and other means." He said Love and the appellant were half-brothers.

The State played the surveillance video, which did not have audio, for the jury, and Detective Williams explained what transpired. He stated that at 3:55 p.m., the video showed the appellant arriving at the restaurant for his 4:00 p.m. shift. The appellant was in a red car with a "white area on the back." The car was driven by an individual, later identified as Love, who was wearing a dark, hooded sweatshirt. After the appellant got out of the car, he and Love conversed through the passenger-side door before the appellant went into the restaurant. Love briefly went inside the restaurant before returning to the car and driving away. Detective Williams said he learned the appellant "routinely" came to work in the red car.

Detective Williams testified that the video also showed that the appellant and Love "were in close proximity" three times immediately before the robbery. He said,

> [The first instance occurred] when [the appellant] left at 11:59 to go to the dumpster. 11:59 and forty-five seconds, [the appellant's] at the dumpsters with a cart. [Love] emerge[d] from behind the building, a concealed location, and [came] into close proximity with [the appellant] for a period of time.
>
> . . . .
>
> [The second instance occurred when Love] entered the building through a customer entrance in proximity to where the restrooms are. [At 12:01 a.m. and fifty seconds, the appellant] exited from behind the customer service counter into that same area, and there was a period of two plus minutes before they both reemerged out the same door that [Love] had [come] in, so we believe they were together at that time.
>
> . . . .
>
> And then a third time [occurred at 12:05 a.m.] where they both exit the customer entrance one behind the other. [The appellant went] to the dumpster and shut the door. [Love went] to his concealed location, I'm assuming to retrieve something, and they both reenter[ed] the same door together. [The appellant] actually linger[ed] at the door and wait[ed] for [Love]

to catch up, and they enter[ed] the door together.

Detective Williams testified that between 12:05 and 12:31 a.m., the video showed "[n]othing remarkable." However, at 12:31 a.m., the video showed Love walking through the kitchen. Detective Williams said that "we believe the hooded individual either hopped over the counter or came through the door that [the appellant] exited behind the counter." Love walked through the kitchen with a pistol in his right hand, pointed the pistol at an employee, and pushed the employee through the kitchen. Love forced additional employees through the kitchen as he walked toward the restaurant office, where Melissa Walker was counting money. Love stood at the office door, pointed the pistol at Walker, threw a bag to her, and instructed her to place the money inside. While she complied, an employee ran out the back door, went to a neighboring business, and called police. After Walker filled the bag with money, Love picked up the bag, exited through the back door, and ran from the scene. Walker called the police after Love left.

Melissa Walker testified that she was the night shift manager at the restaurant and that five or six employees worked the night shift. At the time of the robbery, the appellant had been working at the restaurant for a couple of months as a night shift "line worker." He was usually driven to work by someone in a red car that "had white on the sides of it on the back." She said that the restaurant had three doors that were open to the public: one in the front of the building and two on the side of the building closest to the parking lot. An employee-only door at the rear of the building was used to take out the trash. The trash cans and a storage building were behind the restaurant in the back of the parking lot. Walker said that the employee area behind the front counter was separated from the customer lobby by a door that was unlocked from the inside but locked from the outside.

Walker testified that an "old car show" was being held on the weekend of April 20 and that the event increased business. Ten or fifteen minutes after midnight, Walker told the appellant to clean the front lobby in preparation for closing. No security cameras were in the lobby. When the last customers left about 12:20 a.m., Walker locked the doors. Walker closed the registers and went to the office to count the money. She said that she heard an employee yell, turned, stood up, and saw "all my people being shoved down to the ground right in front of the office door." She also saw a man with a bandana over his face and dressed in a dark hoodie, dark pants, and a hat.

Walker testified that the robber threw a bag toward her and told her to put the money into the bag. She complied because she was terrified and did not want anyone to get hurt. Once the bag was filled, the robber grabbed the bag and ran out the back door. Walker said she could not see the robber's face and could not identify him. She said his hands were "dark complected," meaning he was "[e]ither Hispanic or black or one with darker skin." The State

showed Walker a photograph of Love's pants and hooded sweatshirt, and she said they were "just like what the robber was wearing." She said the bandana that had been taken from Love appeared to be the bandana she saw on the robber. Walker said that she had seen Love standing and walking in the courtroom and that Love's body size was the same as the robber's body size.

Walker testified that after the robbery, she called the police, and they arrived about five minutes later. She said that the appellant was "sitting there with the rest of the employees" and that the employees stayed at the restaurant until about 3:00 a.m., when the police told them that the money had been found. Walker said that the appellant usually left with her so that she could drop him off at a motel near her home. She said she did not notice anything unusual about the appellant that night "other than everybody was a little jumpy and shaky after what happened." Walker said that she did not know how much money was in the safe but that they typically kept about $3000 in order to make change.

On cross-examination, Walker testified that about 12:30 a.m., she walked the last customers out of the restaurant's front door and shut the door behind them. She did not notice anyone in the restaurant who was not supposed to be there. She had been in her office no more then five minutes when she saw the robber. The defense played the video of the robbery, and she identified the appellant sitting on the floor. She acknowledged that one of the appellant's responsibilities that night was to take out the trash and that it would not have been unusual for other people to have been in the parking lot. She acknowledged that the restaurant had had problems with people hanging around the dumpster previously and said that "[w]e'd had some teenagers that had been out there a couple of months before that we had to chase off several times."

On redirect examination, Walker acknowledged that if someone had come into the restaurant at 12:06 a.m., they would have been served. She testified that she locked the front door when the last customer left about 12:30 a.m. She had already locked the two side doors. She acknowledged that in order for someone to have gotten into the restaurant at that point, an employee would have had to open the doors from the inside. She did not receive any reports of someone loitering around the dumpster that night.

Justin Israel, the "owner operator" of the restaurant, testified that on August 20, 2008, he was called to the restaurant around 12:30 a.m. because of the robbery. When he arrived, he spoke with police and learned that money taken from the restaurant had already been located. Israel said that at 12:30 p.m., approximately twelve hours after the robbery, he was walking on a road near a creek behind the restaurant and saw a gun. He called the police, and "they dealt with it from there."

-4-

Officer Todd Myers of the Gatlinburg Police Department testified that while he was searching for the suspects on the side streets and the creek area behind McDonald's, he found a bag containing money. The bag was located underwater near a culvert.

Officer Cindy Myers of the Gatlinburg Police Department testified that when she began her shift at 6:00 a.m. on August 20, 2008, she was told of the robbery. The suspect was described as "a black male, skinny build, about six foot [wearing] a black sweatshirt and blue jeans, possibly could have a ball cap and possibly white tennis shoes." She was also advised that the suspect had been armed. Officer Myers began her regular patrol and also checked locations where someone could hide. Around 7:30 a.m., she went into a coin laundromat located approximately 100 yards from the McDonald's and saw Love sleeping in a chair. He was wearing a black sweatshirt with the hood up, blue jeans, and brown or black shoes. Officer Myers left the laundromat and called for backup. After three officers arrived to assist, Love was apprehended. The officers patted Love down and discovered a disassembled cellular telephone, some change, and a wallet. As Love was escorted to a police cruiser, Officer Myers noticed that his shoes made a noise when he walked and that the shoes "were kind of squishy like maybe they were wet or had been wet at some point because . . . they were retaining water." Love was transported to the Gatlinburg Police Department.

Officer Luke Walker of the Gatlinburg Police Department testified that he responded to Officer Myers' request for backup at the laundromat. After the officers apprehended Love, Officer Walker handcuffed him and helped to perform a pat-down search of Love's person. In Love's back pocket, Officer Walker found a wallet, which was "soaking wet." In the front pocket of Love's sweatshirt, Officer Walker found a cellular telephone. The battery had been taken out of the telephone, and the telephone "was opened . . . like it was there to dry." Officer Walker noticed that Love's pants and shoes were damp. Officer Walker surmised that Love had "probably put his pants in the dryer for a brief period of time but didn't want to be sitting around in his underwear." He put Love into a police cruiser, advised him of his rights, and transported him to the police station. During the ride, Love told Officer Walker "that he was at the Party Hut that night and then went to Sunny's to wait for his brother to show up." Officer Walker said that at the time of the robbery, Sunny's had been closed for approximately three weeks.

Detective Keith Brackins of the Gatlinburg Police Department testified that he arrived at McDonald's around 1:00 a.m. He took statements from the witnesses and obtained the surveillance footage. He recalled that while he was at the restaurant, a camouflage bag of money was recovered from a culvert at the nearby creek. Detective Brackins said that the bag was "real wet." Inside the bag was $4663, mostly in small bills and change. He estimated that the water in the creek was approximately six to eight inches deep.

Detective Brackins testified that the clothes and shoes Love was wearing when he was apprehended appeared to be the same as those worn by the robber in the surveillance video. Detective Brackins said Love had a blue bandana in his possession at the police station. Detective Brackins learned that Love and the appellant were half-brothers and that they shared the same address.

Officer Logan Carr of the Gatlinburg Police Department testified that he responded to McDonald's after the robbery and took statements from some of the employees. He said that when he asked the appellant which direction the suspect ran, the appellant pointed "[o]ne hundred and eighty degrees the other way, directly the other way" from the laundromat where Love was later found.

The jury found the appellant not guilty of aggravated robbery but convicted him of the lesser-included offense of facilitation of aggravated robbery, for which he received a nine-year sentence. The jury convicted Love of aggravated robbery. As his sole issue on appeal, the appellant challenges the sufficiency of the evidence sustaining his conviction.

## II. Analysis

The appellant contends that the evidence was insufficient to sustain his conviction. He acknowledges that "there are circumstantial facts that could lead to a conclusion that [he and Love] colluded together," but he maintains that the State failed to prove beyond a reasonable doubt that he knowingly furnished substantial assistance in committing the robbery. Specifically, he argues that the State failed to show that an understanding existed between him and Love, that he provided assistance to Love, or that he knew a robbery was to take place. The State contends that the only way Love could have gained access to the locked restaurant was if the appellant let him in and that the jury reasonably inferred the appellant did so. We conclude that the evidence was insufficient to sustain the appellant's conviction.

On appeal, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the

credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

A guilty verdict can be based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting State v. Marable, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Genaro Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)).

Aggravated robbery is defined as robbery "[a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon." See Tenn. Code Ann. § 39-13-402(a)(1). Robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a). A theft of property occurs when someone, with the intent to deprive the owner of property, knowingly obtains or exercises control over the property without the owner's effective consent. Tenn. Code Ann. § 39-14-103. "A person is guilty of the facilitation of a felony if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under [Tennessee Code Annotated section] § 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony." Tenn. Code Ann. § 39-11-403(a).[1]

The State argues that the appellant provided substantial assistance to Love by letting Love into the locked restaurant. We have reviewed the video played for the jury. The video shows the appellant leave the employee area inside the restaurant at 12:01:50 a.m. Next, it shows the appellant outside, walking to the dumpster, and closing the door. The appellant walks back to one of the customer doors on the side of the restaurant and waits. Meanwhile, the hooded man, presumably Love, comes out from behind the shed and walks toward the same door. At 12:06:37 a.m., the appellant and Love enter the restaurant together. Ordinarily, the restaurant closed at midnight. However, on April 20, 2008, the restaurant closed twenty to thirty minutes late. Therefore, the restaurant was not closed and the doors

---

[1]Tennessee Code Annotated section 39-11-402(2) provides that a person is criminally responsible for the actions of another when, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense."

were not locked when Love entered with the appellant. The State did not present any evidence that Love exited the building after 12:06 a.m. or that the appellant let him in after the doors were locked.

The State also claims that "[t]he proof revealed a string of events involving the defendant and co-defendant that establish that, without the defendant's inside knowledge of the restaurant and its closing structure, the co-defendant would not have been able to accomplish the robbery." However, the State presented no evidence to support that claim. The mere fact that the appellant and Love were in close proximity to each other three times between 11:59 p.m. and 12:06 a.m. does not provide the substantial step necessary to support the appellant's conviction for facilitation to commit aggravated robbery. Therefore, the appellant's conviction must be reversed.

### III. Conclusion

From the foregoing, we conclude that the evidence was insufficient evidence to sustain the appellant's conviction. Therefore, the judgment of the trial court is reversed, and the charge is dismissed.

_____
NORMA McGEE OGLE, JUDGE